## THE CHICAGO, BURLINGTON AND QUINCY R. R. Co.

### v.

## ALFRED HALE.

1. COMMON CARRIER—LIMITING LIABILITY.—It would seem that the common law liability of a common carrier may be limited by a special contract signed by both the contracting parties, except that public policy requires that the carrier should not be allowed to stipulate against the consequence of its own actual negligence or willful default.

2. ACTION FOR LOSS—DESCRIPTION OF CONTRACT.—In an action against a common carrier for injuries or loss, whether the form be in assumpsit or case, the contract of shipment should be correctly described in the declaration.

3. INSTRUCTIONS—DUTY OF COURT.—In instructing the jury as to the contract, upon the question of its construction, or whether there was duress or false representations or any other reason why the contract executed by the

consignor was invalid, or whether it was signed by an agent without author-
ity to conse..t to a limitation of the carrier's liability, the court should have
stated to the jury, the facts which would render the contract invalid, and not
have left it to the jury to determine whether they would consider it a lawful,
binding contract or not.

4. DISTINCTION BETWEEN CONTRACT AND CONDITIONAL RECEIPT.—An
instruction that unless the consignor assented and knowingly intended to
assent to the restrictions in the contract, the defendant would not be relieved
from its common law liability, and that the jury were to determine whether
the consignor understood the terms of the receipt, is erroneous. Although
this may be the rule where the consignor merely took a receipt containing
conditions, yet where a contract is executed by the shipper, and there is no
reason why it should not be held valid, it is not a question to be left to the
jury to determine whether or not the consignor understood its terms.

5. MEASURE OF DAMAGES.—If the consignee had been under a binding
contract for the use of the article transported, for the breach of which he might
have been made liable in damages, and the carrier had notice of such con-
tract, it would be proper to make the carrier liable for the injury to which
the consignee might have been subjected by such breach, and it would then
become an element of damage, but in the absence of proof of some such
special loss, only a fair compensation for the actual injury sustained should be
allowed, which would be the actual diminution of the market value, by the
injury, if caused by the negligence of the carrier; and not to exceed one hun-
dred dollars, as limited by the contract, if there were such a contract.

APPEAL from the Circuit Court of Warren county; the Hon.
ARTHUR A. SMITH, Judge, presiding.

Mr. W. C. NORCROSS, for appellant; that the damage should
be limited to actual compensation—the difference in value of
the property before and after the injury—and that the court erred
in refusing defendant's instruction upon that question, cited
Ill. Cent. R. R. Co. v. Finnigan et al. 21 Ill. 648; T. P. & W.
R. R. Co. v. Arnold, 43 Ill. 418; Faulkner v. South Pacific R.
R. Co. 51 Mo. 311; Poucher v. N. Y. Cent. R. R. Co. 49 N. Y.
263; Mulligan v. Ill. Cent. R. R. Co. 2 Am. R'y R. 322; Had-
ley v. Baxendale, 26 Eng. L. & Eq. Rep. 402; G. W. R'y Co. v.
Redmayne, C. & P. 329; Farnham v. C. & C. R. R. Co. 55 Pa.
St. 53; Clark v. R. & C. R. R. Co. 14 N. Y. 570; Hamilton v.
McPherson, 28 N. Y. 76; Ottawa Gas Light & Coke Co. v.
Graham, 28 Ill. 73; Robinson v. Varnell, 16 Tex. 382; Sedg-
wick on Damages, 201; 2 Parsons on Con. 241; Kennedy v.
North Mo. R. R. Co. 36 Mo. 351.

Instructions not resting on evidence in the case are erroneous: Hooley v. Brooks, 20 Ill. 116; Paulin v. Howser, 63 Ill. 312; Gibson v. Webster, 44 Ill. 483.

Prospective or speculative damages should not be allowed: Wilson v. Lancashire, etc. R. R. Co. 30 L. J. C. P. 232; 2 Greenleaf on Ev. 240.

The court erred in modifying defendant's sixth instruction. As originally asked it was correct: Davis v. M. S. & N. Ind. R. R. Co. 22 Ill. 2'3; Warren v. President, etc. 15 Ill. 236; C. R. I. & P. R. R. Co. v. Fahey, 52 Ill. 81; Sutphen v. Cushman, 35 Ill. 186.

Testimony as to probable profits should not have been allowed: I. B. & W. R. R. Co. v. Barney, 71 Ill. 399; Sedgwick on Damages, 82; Sherman & Redfield on Negligence, 599.

The damages cannot exceed the limit named in the special contract: Pierce on Railroad Law, 420; I. C. R. R. Co. v. Owens, 53 Ill. 391; Lang v. N. Y. Cent. R. R. Co. 50 N. Y. 76; 2 Kents' Com. 638.

Mr. J. W. Davidson, for appellee; that unless restricted in their liability by special contract, the company were insurers of the property, and by accepting the property its liability became fixed, cited 1 Parsons on Con. 653; C. & A. R. R. Co. v. Koener, 77 Ill. 11; C. & A. R. R. Co. v. Shea, 76 Ill. 47; Mer. Dispatch Co. v. Moss, et al. 76 Ill. 520; Mer. Dispatch Co. v. Smith, 76 Ill. 542.

Probable profits may be considered in estimating the damages if the plaintiff prove that such profits were reasonably certain: Sherman & Redfield on Neg. § 594; Frazer v. Smith, 60 Ill. 145; Ill. Cent. R. R. Co. v. Cobb, et al. 64 Ill. 128.

The jury are to judge of the weight to be given to the testimony of witnesses, and two juries having passed upon this case with the same result, their verdict ought not to be disturbed: Wallace v. Wren, 32 Ill. 146; White v. Clayes, 32 Ill. 325; Umlauf v. Bassett, 38 Ill. 96; C. & R. I. R. R. Co. v. Coal & Iron Co. 36 Ill. 60; Tolman v. Race, 36 Ill. 472; C. & R. I. R. R. Co. v. Hutchins, 34 Ill. 108; Schultz v. Lepage, 21 Ill. 160; Smith v. Schultz, 1 Scam. 490; Allen v. Smith, 3 Scam.

C. B. & Q. R. R. Co. v. Hale.

97; Ellis v. Locke, 2 Gilm. 459; Evans v. Fisher, 5 Gilm. 572; Dawson v. Robbins, 5 Gilm. 72; Mann v. Russell, 11 Ill. 586; Weldon v. Francis, 12 Ill. 460; Morgan v. Ryerson, 20 Ill. 348; Martin v. Ehrenfels, 24 Ill. 189; Pullian v. Ogle, 27 Ill. 189; Deferest v. Oder, 42 Ill. 500.

If the verdict is warranted by the evidence, it should not be disturbed: Lowry v. Orr, 1 Gilm. 70; Brown v. Crum, 24 Ill. 78; Jenkins v. Brush, 3 Gilm. 18; Sullivan v. Dollins, 13 Ill. 85; Raney v. Monegan, 3 Gilm. 85; Green v. Lewis, 13 Ill. 642; Ill. Cent. R. R. Co. v. Hays, 19 Ill. 166; O. & M. R. R. Co. v. Brown, 25 Ill. 124; Keely v. O'Brien, 66 Ill. 358; Dunning v. Fitch, 66 Ill. 51; O'Brien v. Palmer, 49 Ill. 72; Bradley v. Griselman, 22 Ill. 494; C. B. & Q. R. R. Co. v. Stumps, 69 Ill. 409.

Where the testimony is conflicting, it is the province of the jury to weigh it, and their decision will not be disturbed unless there is manifest injustice: Summers v. Stark, 76 Ill. 208; Edgmon v. Ashelby, 76 Ill. 161; Clifford v. Lehring, 69 Ill. 401; Bishop v. Busse, 69 Ill. 403; Jackquin v. Davidson, 49 Ill. 82; Baker v. Robinson, 49 Ill. 299; Hartly v. Hartly, 49 Ill. 302; Labor v. Scanlon, 49 Ill. 152; McCarthy v. Mooney, 49 Ill. 247; Keightlinger v. Egan, 75 Ill. 141; Plummer v. Rigdon, 68 Ill. 222: Miller v. Balthasser, 68 Ill. 302; Gilbert v. Bone, 79 Ill. 341; Holcomb v. The People, 79 Ill. 409.

Instructions should be based on the evidence: Reno v. Wilson, 49 Ill. 95; Hartford v. Obrecht, 49 Ill. 146; Baker v. Robinson, 49 Ill. 299; Ill. Cent. R. R. Co. v. Burton, 69 Ill. 174; Gilchrist v. Gilchrist, 76 Ill. 281; Olsen v. Upshal 69 Ill. 273; Baker v. M. S. & N. Ind. R. R. Co. 42 Ill. 73.

LELAND, J.  The appellee sued appellant in an action on the case for injury sustained by an ass which was shipped at Burlington, Iowa, to Monmouth, Ill., April 23d, 1874. The first count was for the injury and consequent total loss of the ass. The second was like the first, with an additional allegation that the animal was bought and owned for the sole and only purpose and use, and to be kept and stood by plaintiff for service as a foal-getter, and that the use for 1874, as such foal-getter,

was reasonably worth $400, etc. After this case had been to the Supreme Court (83 Ill. 360), the second count of the declaration was amended by adding a statement that the railroad company had notice, when the animal was shipped, that appellee intended to use him as a foal-getter, and the further statement that appellee had contracted for a large number, to wit: twenty-five mares to be bred to said jack for the year 1874. There was a verdict of $300 for appellee. It was contended by appellant that the animal was shipped under a written contract by the terms of which the amount of the damages, if any, was limited to one hundred dollars, and that appellant was not to be liable for injury or damages *which the ass might do to himself.* Appellee, who was not acquainted in Burlington where he bought the animal for $200, left it to a colored person, one Dr. Tyler, the vendor, to attend to the shipping of the ass, and went home. The doctor did enter into a written contract to the effect as stated, and which he signed thus:  "Dr.+Tyler." The contract was one of the long, printed live stock contracts used by appellant, of which each of the contracting parties had a copy. The doctor says he gave his copy to the appellee, and the latter says he did not get it, and never saw it.

It becomes necessary, perhaps, to state more fully than usual the evidence on the subject of the physical disability of the jackass.

Appellee, who was also a colored person, testifies that the ass was rendered so he could not walk; whether his ankle was broke clear loose or not, it was broke so that his leg dangled every way; that he led him down town on three legs; he could not put the fourth to the ground; that he did not, any time that day, put the fourth to the ground; that when he held his foot up, the ankle just swung loose all about; can't say whether it was broken or pulled out; that his hip was perished away, etc.

Parry says that on the next day after his arrival, he was on three legs; could bear no weight on his left hind leg; that the injury (leg) at first did seem like it might come kinder stiff, and he could use it to be of some service, but it appeared like it was a great while getting so. The last time he saw him, the leg appeared to have shrunk up, and the hip was swaning

away; that he cannot recollect how limber the joint was at the bottom, but the hip was all swaning away, and that he considered that he was gone up; that he was permanently disabled the last time he saw him; that he stood on three legs at the time of the trial, in May, 1875.

Todd says he was present when Hale took the jack from the depot; saw jack standing on three legs; thought the animal in much pain.

Arms, a railroad employee, who wrote the words "received in bad order, very lame," says, however, "he did so because Hale refused to receive him. Did not notice there was anything the matter with him till after he was led into the depot building. He went out of the car the same as any other horse would, on all four feet."

Richey says he was lame in hind leg; don't think he was fit for mares; did not make a careful examination when he saw him lame. The foregoing is all there is for appellee. Appellee's counsel alludes to the evidence of Dr. Van Hoorbeke, a veterinary surgeon (who was taken by appellee to examine the animal just before the trial in May, 1875, but who was introduced by appellants as a witness on the last trial), as stating that the hip of the Jack was then perished. We have looked at the evidence of this witness carefully, and find it very strong for appellants. It is to the effect that he has experience as to such matters; that he made a very careful examination of the animal, at appellee's request, and especially felt of his legs; that the animal was led around, that he walked perfectly well, and that there were then (May, 1875) no indications that he had ever received any injury of the kind claimed. He expresses himself strongly and emphatically that there was no perishing of the hip; no indication of any injury whatever.

Peter (alias Stonewall) Jackson says he saw the jack at the depot, discovered that he was some lame; that Hale led the jack by the halter. He walked a little lame when we led him away from the freight house; did not go on three feet, went away on all four of them. Oh! no, sir! his leg was not broken or dangling; noticed the hind legs of this jack, and felt them; had long pastern joints; didn't think the injury was of any consequence.

Fargart says he saw the jack about first of June, 1874, in barn-yard, at Hale's residence. He seemed to be some lame in one hind foot. He walked on all feet; think the injury to the leg was but slight; there was no swelling to the limb that he could see. The injury would be very slight, not to exceed one-eighth or one-tenth of its value; perhaps less than that. Don't know as he could examine him as careful as if he had handled him. Still he knows about what he was like.

Clark says he saw the jack about the time the case was tried before (May, 1875); was requested to look at him; didn't discover anything wrong with the jack's leg; thinks he would have noticed the shrinkage of the hip if it had been shrunk; didn't discover anything wrong with the jack at all; was very close to him in the stable. Jack moved around from side to side in the stall. He was standing in the stall, not lying down. He, witness, was right at the animal. He thinks they asked him if there was anything the matter with the ass' legs. While he, witness, was in the stall, jack seemed to be all right.

Skinner says the jack had a very curious shaped hoof. It was long and turned up like a half-moon. It was grown out to a point like a toe. Should not have noticed it, but it was a curiosity.

Davidson, a witness, who says he was raised in a jack and mule country, and who, therefore, certainly ought to be able to tell whether a jackass was lame or not, was indiscreetly called as a witness by appellant, though he was the counsel for appellee. He gave an intelligent and interesting account of a joint observation of the animal while being led by himself and the attorney of appellant, in May, 1875, and while both were examining him as counsel with a view of settlement. As is not unusual under similar circumstances, the two could not agree whether the ass was lame or not, nor in which hind leg it was, if either. To the question, "Was there any lameness visible in that jack at that time?" witness said, " I say there was, and I say I selected the leg at once and pointed you to it, and you know it." In answer to the question, " Tell that jury whether that jack went on four feet at that time?" witness said, " I think he put that foot to the ground a little, but I

C. B. & Q. R. R. Co. v. Hale.

think he limped on it." To this question, "Will you please tell that jury if I did not pretend to you that the wrong leg was lame. Didn't I for some time on that occasion?" the Colonel, with probably some excusable asperity of manner, replied, "I know nothing about what you pretended; I know I pointed to you which leg it was, and told you it was as plain as the nose on your face."

With an air of skepticism on one side and of faith on the other, this colloquy is continued somewhat farther. The above, however, is all of it that is material to the ends of justice, and the foregoing is the substance of all the evidence as to the disability of the ass.

What became of him does not appear. Appellee says he gave him to George May, another colored man, and that the last he heard of the jack, he was down in Mercer county. He also speaks of a rumor of his decease; but as to whether he is now dead, or whether he is lucratively employed in Mercer county or elsewhere, we are entirely uninformed from the evidence.

It does most clearly appear, however, that diligent effort upon the part of the attorney of the appellant to obtain an interview with him, has, in some unaccountable way, been rendered entirely unavailing.

Upon careful examination of the evidence, there appears to be some mystery about the case. If the ass, like the one Balaam rode, could speak, he might probably have said that by means of the jolting of the car and the unusually long leverage of the hoof, a loose pastern joint had been somewhat strained, but that otherwise he was in his usual health and spirits. As the case, however, is to be tried again, we refrain from expressing any opinion upon the foregoing facts as to whether such was probably the case or not. It is also possible that the ass was so sorely smitten, that by means thereof he has really suffered more serious injury—perhaps a death, susceptible of proof on another trial.

The injury may have been somewhat microscopically presented on the part of appellee, and the jury, as is sometimes the case where there is an individual plaintiff and a corporation

defendant, may have been liberal in the amount of the damages. Still, if the law, as to the measure of damages and otherwise had been laid down correctly, perhaps the verdict and judgment ought to stand.

Are there any errors of the Court which require in this case, that there should be a reversal?

The first question in order would seem to be that in relation to the contract of shipment. If the live stock contract has been properly executed, and if we have heretofore stated its terms accurately as to the $100 limitation, and if such a limitation were proper, that would seem to be all that would be necessary to a reversal, unless there was actual negligence. The contract was admitted in evidence without objection, and there seems to be no doubt about the damages for the injury or destruction of the ass being therein limited to $100. The court below left to the jury two questions of fact: First, did Dr. Tyler have authority from appellee to sign the contract? Second, did he exercise such authority, and understandingly execute it?

Although appellee saw the railroad officers, and talked about the price for the conveyance of the ass from Burlington to Monmouth, the Doctor seems to have acted in making the contract as though he were the consignor, sending the ass to Monmouth to appellee as consignee. In fact the only delivery of the ass to appellee was the delivery to the carrier. Appellee, in his evidence, says: "I had not paid Doc Tyler for him then, but paid him about a week after. I employed Doc Tyler. I did not employ him really, but Doc Tyler told the agent, in my presence, that he would deliver him to-morrow, when he would ship him, and he told me to look here on the three o'clock train for him, at Monmouth. I did not deliver the jack to the railroad company; no written contract between me and the agent; jack not present when I talked to the agent; I did not, at any time, deliver the jack to any agent of the C. B. & Q. The jack was shipped the next day after I bought him." The Doctor says he sold the ass, and was to deliver him on the train at Burlington, and that he put him on it.

No objection seems to have been taken to the lawful rights

of the parties to thus limit the common law liability of the common carrier, and it would seem that it might have been so done by the contract signed by both the contracting parties. Field v. Ch. &. R. I. R. R. Co. 71 Ill. 458; Anchor Line v. Dates, 68 Ill. 369; I. C. R. R. Co. v. Frankenburg, 54 Ill. 88; Adam's Express v. Haynes, 42 Ill. 89; Arnold v. I. C. R. R. Co. 83 Ill. 273; Erie Railway Co. v. Wilcox, 84 Ill. 239, except that public policy requires that it should not be allowed to stipulate against the consequence of actual negligence or willful default on the part of the carrier.

The form of action selected was *ex delicto.* Whether, however, the form be assumpsit or case, the contract of shipment should be correctly described in the declaration. Angell on Carriers, Secs. 440 and 446. Though the contract of shipment may have been made by the consignor, Dr. Tyler, the appellee could well sue on it in case for a neglect of duty by the carrier. Angell on Carriers, section 497; Stafford v. Walter, 67 Ill. 83. If, therefore, there were a special contract of the character mentioned, it might be questioned whether the evidence was not so variant from the declaration as not to support the alleged case.

The instructions in relation to the contract are in some instances erroneous. By the expression in plaintiff's first instruction, " or by special contract limiting its liabilities," the question whether there was a written contract, and if so, what was to be its construction, was left entirely to the jury. If there were duress, fraudulent representations, or any other reason why the contract executed by the consignor was invalid, or if the contract was made by Dr. Tyler merely as an agent for appellee, without any authority to consent to a limitation of the common law liability of the carrier, the court should have stated the facts, which would render the contract invalid, and not have left it to the jury to determine whether they would consider it a lawful and binding contract or not. In a case like this the jury might say that the Doctor did not write, therefore he could not read. The contract was a long printed thing. He had sold his ass, and thereafter had no particular interest in Hale; and we think he did not care what he did sign, and we will not hold

appellee to it. The law, however, is that a man must ascertain what he is signing.

The sixth instruction is clearly wrong. It is to the effect that though Tyler were the agent of appellee, still, unless he assented, and knowingly intended to assent, to the restrictions contained in the contract, it would not relieve the defendant from its liability as a common carrier, and that it was a question for the jury to determine whether the terms of the receipt were understood by said Tyler.

This might do for a case where the consignor did not sign a contract, but merely took a receipt, containing conditions, as in the cases heretofore cited from the 42d, 54th, 68th, 71st Ill. Where, however, a contract is executed by the shipper, and there is no reason why it should not be held valid, we think it is not a question to be submitted to the jury to determine whether the terms of the contract were understood by the signer, but that, under the law, it is a contract. There are qualifications of appellant's instructions and others, presenting the same questions, not necessary to notice.

There were a great many objections on the part of appellant to the introduction of evidence, and some of them seem unreasonable.

We do not propose to spend time in writing about each one of them. They are mainly on the questions of the measure of the damages, and more particularly on the specially remunerative or second branch of that subject.

The rule laid down by the court in its instructions and other rulings, was substantially, 1st, direct injury to the Jackass; 2d, such special damages in addition, as plaintiff was entitled to have for the loss of the Jack on contracts for the year 1874, made previous to the shipping, if appellant had notice at the time of shipping that the animal was to be used for foal-getting purposes.

The objection to this rule of damages is, that there is nothing in the evidence on which to base it. The appellee himself testifies that there were no contracts made under the engagements of the mares; that he did not think he could have made any definite contracts till the jack got to Monmouth, and people

C. B. & Q. R. R. Co. v. Hale.

had looked at him; that he had made no contracts, neither as to the amount that was to be paid, nor on what plan it was to be paid, insurance or otherwise, nor when it was to be paid; that none of the men he had talked with had ever proposed to pay for the service of the jack, by the season or by the single leap—nothing was said on the subject.

If there had been a binding, legal contract, for the breach of which appellee might have been liable in damages, it would have been proper to make the carrier, with notice of it, liable for the injury to which appellee might have been subjected by such breach; but there was no such state of facts as would authorize such damages. The mare owners could use the jack or not, as they pleased. Consequently, if it were proper to add to his value what he could have earned in 1874, why not in subsequent years?

If the jury had not, under the direction of the court, given more than a fair compensation for the actual injury, we might have let the verdict and judgment stand; but the law will not allow for the full market value, and also for those remunerative properties which are a mere element of value.

We have examined the authorities cited as to the proper measure of damages, and we are satisfied that the rule in this case, upon the uncontroverted facts as to appellees arrangement with farmers for the use of the animal, should be the actual diminution of the market value by the injury, if caused by the negligence of the carrier, and one hundred dollars, or less, if there were a special contract limiting the liability, and no negligence, and perhaps if the ass did not injure himself by his own imprudence.

We perceive no evidence tending to prove a valid contract by which appellee, or any of the farmers of Warren, were bound, in relation to the services of the ass. They might, when they beheld him on his crescent-shaped hoofs, properly have made objections to his use. These non-foal-getting damages, which the jury has evidently added to the actual value, under the rule laid down, were improper.

For the reasons mentioned, the judgment must be reversed and the cause remanded                Reversed and remanded.